**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | |
|---|---|
| **ANDREA PERRY,** | CASE NO.: 1:16-CV-01522 |
| **and** | |
| **NING XU** | JUDGE: CHRISTOPHER A. BOYKO |
| **6436 WALNUT FORK DR** | |
| **WESTERVILLE, OH 43081-7105** | |
| **for themselves and on behalf of all** | |
| **others similarly situated,** | |
| Plaintiffs, | **SECOND AMENDED CLASS** |
| | **ACTION COMPLAINT** |
| -vs- | |
| **ALLSTATE INDEMNITY** | |
| **COMPANY,** | |
| Defendant. | |

Plaintiffs Andrea Perry and Ning Xu, on their own behalf and on behalf of all other Ohio residents similarly situated, for their Second Amended class action complaint against Defendant Allstate Indemnity Company, state:

1.　　Defendant Allstate Indemnity Company ("Allstate" or "Defendant") is a subsidiary of The Allstate Corporation ("Allstate Corporation"), a publicly traded company that owns and controls Defendant.

2.　　Defendant is, or at a point in time relevant to this case was, licensed to sell property and casualty insurance in the State of Ohio.

3.　　Defendant maintains numerous offices in Ohio for the conduct of its usual and customary business, including the sale of insurance policies.

## PARTIES

4.     Plaintiffs are residents and citizens of the State of Ohio.

5.     Defendant Allstate is organized under the laws of the State of Illinois and headquartered in Northbrook, Illinois.  Allstate is authorized to sell property insurance policies in the State of Ohio and is engaged in the insurance business in the State of Ohio, including Cuyahoga County.

## JURISDICTION AND VENUE

6.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(d)(2).  There are more than 100 members in the proposed class, at least one member of the proposed class has state citizenship that is different than Defendant's, and the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Defendant as Defendant has sufficient minimum contacts with the state of Ohio, is authorized to do business in Ohio, and has availed itself of the privilege of conducting business in the State of Ohio.

8.     Venue is proper in this forum pursuant to 28 U.S.C. §1391(b) because Defendant has its agent for service of process in this District, for conducting business in this state, including the conduct alleged in this complaint.  Venue is also proper pursuant to 28 U.S.C. §1391(c) because Defendant is a corporation deemed to reside in this District.

## THE WRONGFUL CONDUCT

9.     This case involves systematic adjusting practices used by Defendant to understate, and under-pay, the actual cash value of property damage suffered by its insureds, thereby denying its insureds (including Plaintiffs) the full amount of indemnity to which they are entitled.

10.     Defendant intentionally and fraudulently made affirmative misrepresentations to its insureds to conceal its unlawful claims adjusting practices from its policyholders and state regulators so as to avoid lawsuits of this nature, and in the hope of running out the clock on claims under Defendant's contractual time limit buried in Defendant's standard insurance policy.

11.     Defendant routinely understates actual cash value by depreciating the labor and other non-material components of repair costs, instead of only the physical item that is subject to wear, tear, and obsolescence, and also depreciates contractor overhead and profit even though those items are not subject to wear, tear, and obsolescence.

12.     Defendant lies to its policyholders by affirmatively telling them that only physical "items" that suffer wear and tear are being depreciated, while Defendant surreptitiously deducts unlawful non-material depreciation and fraudulently conceals it from its policyholders.

13.     Traditionally, and prior to the advent of the computerized property insurance claims estimating software programs, property insurance adjusters adjusting structural damage claims were taught only to depreciate materials, and not depreciate labor, when calculating ACV.  *See, e.g.*, Don Wood *et al.*, *Insurance Recovery After Hurricane Sandy: Correcting the Improper Depreciation of Intangibles Under Property Insurance Policies*, 42 TORTS, INS. & COMPENSATION L.J. 19, 24 (Winter 2013) ("I was taught many years ago that depreciation, when it was applied, must be done on a line-by-line, item-by-item basis…. I obtained charts of the average lifespans of materials.  A few sample pages from the National Association of Home Builders is attached.  Material lifespans shown in the attachment were derived from reports of product manufacturers.  Nowhere in any of the lists of materials is any labor item mentioned …"); Chip Merlin, *Few Judges and Insurance Regulators Worked In Property Claims: Understanding New Insurance Rulings*, PROP. INS. COV. LAW BLOG (August 16, 2017) ("when I was starting out,

an older and experienced GAB [General Adjustment Bureau] adjuster told me they never depreciated labor").

14.     In contrast to the traditional property insurance industry approach, and in the past ten to fifteen years, commercially available claims estimating software programs began to provide a property insurer with the option to withhold a portion of the labor needed to repair a structure as "depreciation" at the same time the program calculated the depreciation arising from the physical deterioration of building materials.  This new option was created as property insurers, and their computer programmers, realized that withholding labor and other non-material costs as "depreciation" could dramatically lower ACV payments.

15.     The computer programs that provide an insurance company with the option to withhold labor as depreciation include not only the software program used by Defendant—Xactimate, but also most of the prevalent claims estimating software programs used today. These claims estimating software programs all provide for the option of withholding non-material depreciation by simply checking or unchecking a box with a computer mouse. For example, the below screenshot from the Xactimate program shows that an insurer can choose to select or de-select "Depreciate Non-Material" and "Depreciate Removal," both of which are labor items.



**Exhibit 1** attached hereto includes similar screenshots from the other primary valuation software platforms: Powerclaim®, Simsol®, and Symbility®.  Like Xactimate®, each allow the insurance company user the option to choose whether or not to depreciate items which are NOT traditional

subjects of depreciation, that is, which are not items that decrease in value due to age, usage, and the like.

16.     Defendant issues company and state-wide directives, to all their property adjusters, instructing them uniformly to either depreciate non-materials or not. Those choosing to do so make that choice because such depreciation results in a tremendous difference (lessening) the amount a property insurer will pay for the ACV of claims.

17.     In 2011, the Ohio Department of Insurance referred to the practice of ***not*** depreciating labor as traditional insurance industry practice. *See Market Conduct Examination of Sandy and Beaver Valley Farmers Mutual Ins. Co. as of June 30, 2011*, Ohio Dept. of Insurance, at 6 (May 21, 2012) ("Sandy and Beaver Valley Exam")[1] (insurer should not depreciate labor on ACV claims "in order to be consistent with the industry practice of not depreciating labor").

18.     As a prominent property insurer that does a significant amount of business in Ohio, Defendant knew or should have known of the existence of the *Sandy and Beaver Valley* examination report.

19.     Despite the Ohio Department of Insurance's position articulated in the Sandy and Beaver Valley Exam, Defendant continued to withhold non-material depreciation from actual cash value payments without any disclosure of that practice in its policies or on the claim estimates provided to policyholders, and continued to purposely withhold that key information from Plaintiffs, the putative class, and the general public.

20.     By at least 2011 then, Defendant was aware of or should have been aware that the Ohio Department of Insurance took a position against the depreciation of labor.

---

[1]     Available    at:    http://www.insurance.ohio.gov/Company/MC/Sandy%20and%20Beaver%20Valley%20Exam%20Report.pdf.

21.     As a result, by 2011, property insurers in Ohio had two primary options concerning non-material depreciation. On the one hand, property insurers could issue restricted insurance policy coverage forms ("non-material depreciation permissive forms") to expressly allow for the new practice of withholding labor and other non-material depreciation.  Those policies would provide actual notice to policy holders that the carrier was depreciating items not traditionally subject to depreciation (such as labor, contractor O & P, etc.)

22.     Property insurers who chose this option had the obvious benefit of substantially lowering ACV claim payments, but risked losing market share based upon newly introduced coverage forms that restricted the amount of coverage provided and would appear to consumers to be weaker, less desirable insurance.

23.     Several property insurers operating in Ohio have long chosen this path.  For example, State Farm and Farmers Insurance both filed an endorsement or amended policy form with the Ohio Department of Insurance that defined "actual cash value" and stated "labor … is subject to depreciation," thus disclosing to regulators and policyholders alike that moving forward labor would be depreciated. Defendant did not do so until June, 2020.

24.     On the other hand, property insurers could also reject the new practice of withholding non-material depreciation from ACV payments.  These carriers continue to pay ACV claims at the traditional, but substantially higher rate.  For example, the Nationwide Insurance Group does not withhold labor depreciation from ACV payments.

25.     Unfortunately, certain property insurers, to obtain an advantage over their competitors and policyholders, rejected both approaches.  These insurers chose not to risk their market share by notifying policyholders, through restricted ACV coverage forms, that they would be depreciating items not typically subject to depreciation.  They chose not to risk their market

share by notifying policyholders, through restricted ACV coverage forms, that they would pay less for ACV payments.

26.     At the same time, these insurers surreptitiously withheld non-material depreciation from ACV payments—without a change of policy forms and without informing policyholders. Defendant took this approach with respect to the claims at issue in this class action.

27.     To make matters worse, Defendant lied to policyholders on loss estimates by describing depreciation as only applying to physical "property" due to "age. Life expectancy, wear and tear (condition) …" thus fraudulently misrepresenting and intentionally concealing its depreciation of non-materials with the intent to deceive its policyholders and prevent them from discovering Defendant's breach of contract.

28.     Simply put, a policyholder cannot discover for example that non-materials are being depreciated by Defendant by the policy language or the repair estimate.

29.     Defendant's conduct was unfair to both its own policyholders and competing property insurers.  Defendant's competitors: (1) continued to pay higher claims rates under policies similar to those used by Defendant; or (2) risked losing market share by creating and disclosing restricted policy forms notifying policyholders that they would begin to pay less for ACV claims. Defendant avoided both adverse consequences through its fraudulent and unlawful actions complained of herein.

30.     When calculating Plaintiffs' and putative class members' ACV benefits Defendant withheld a portion of the labor costs necessary to repair or replace its policyholders' properties under coverage forms that did not permit labor depreciation.

31.     Defendant surreptitiously depreciated costs associated with non-materials, *i.e.*, labor and overhead and profit, etc., throughout its ACV calculations, without revealing this

material fact to plaintiffs, the class members or the public, and concealing same intentionally from them by purposely selecting the setting that conceals, and does not print, the lines showing that non-materials have been depreciated.

32.     Defendant's withholding of labor costs associated with the repair or replacement of the insured properties resulted in Plaintiffs and putative class members receiving payment for their losses in an amount less than they were entitled to receive under policies that never included a form authorizing the practice.

33.     Defendant's conduct also resulted in the Plaintiffs and the putative class being misled that they were receiving proper payment, and misled into believing their contracts were being followed, when they were not.

### Perry's Insurance Claim

34.     The residential home owned by Perry ("the Home"), suffered substantial water damage on or about June 28, 2015.

35.     Much of the Home was damaged and required repair and restoration.

36.     At the time of the loss the Home was insured by Allstate policy no. 000926544718 underwritten by defendant Allstate Indemnity Company. A copy of the insurance policy is attached as **Exhibit 2**.

37.     The policy included, among other coverages, indemnity coverage for physical damage to the Home caused by perils other than those specifically excluded under the policy.

38.     Perry submitted a claim to Allstate and requested payment for the damage to the Home.

39.     Allstate confirmed that the Home had sustained damage due to a covered peril and that Allstate had an obligation and duty to pay Perry for the repair or replacement of the damaged portions of the Home pursuant to the terms of her insurance policy.

40.     Allstate appointed an adjuster, who was located in one of Allstate's centralized adjusting offices in Dallas, Texas, to adjust Perry's claim in accordance with Allstate's adjusting policies and procedures, and that adjuster inspected the damage to the Home for purposes of preparing an estimate of the cost to repair or replace the damaged property.

41.     On September 7, 2015 the Allstate adjuster submitted a final estimate for repair of the damage to the Home, a copy of which is attached hereto as **Exhibit 3**.

42.     Defendant's adjuster determined that the cost to repair the damage to Perry's Home exclusive of mold remediation was $25,566.81.

43.     The repair costs estimated by the Allstate adjuster included costs for material and labor to repair the Home, and sales tax on materials.

44.     Defendant's policy contains no definition of actual cash value ("ACV"), but nonetheless provides that Defendant will only pay the ACV of a loss to the insured until the repair or replacement of the damaged property is completed.

45.     Defendant's estimate provided to Perry calculated ACV as repair or replacement cost of the damaged part of the property less depreciation.

46.     In calculating ACV Defendant reduced the amount it would pay Plaintiff by $4,570.35 for depreciation.

47.     Defendant made a Coverage A – Dwelling Net ACV payment of $20.996.46 to Perry for the damage, exclusive of mold remediation, and Perry received no further Coverage A – Dwelling payments from Allstate.

48.     In making its ACV calculation, Defendant depreciated the labor required to repair the Home.  Unlike a physical "asset," labor does not depreciate over time.

49.     As confirmed above, the fact that this depreciation not only included materials, but also included depreciation of non-materials, was intentionally concealed from Perry, and she could not know this was done based on the policy, or the papers from Allstate and its adjuster.

50.     The fact that Defendant never indicated that it was denying a portion of Perry's ACV claim, by withholding non-material depreciation, deprived Perry of the ability to object to Defendant's unlawful conduct and file suit.

51.     Allstate depreciated costs associated with labor throughout its ACV calculations, including the labor costs for repairing and refinishing walls throughout the Home, in many instances depreciating the labor costs by over 50%.

52.     Because of the extensive scope of the job, consistent with industry practice Allstate added contractor overhead and profit of 20% to the estimate, but Allstate depreciated the contractor overhead and profit when calculating ACV.

53.     Unlike a physical "asset," contractor overhead and profit does not depreciate over time and should not be depreciated when calculating ACV.

**Plaintiff Xu's Insurance Claim**

54.     The property owned by Xu (the "Property"), suffered damage on or about June 28, 2015.

55.     At the time of the loss the Property was insured by Allstate ACV policy no. 000992815406, a copy of which is attached as **Exhibit 4**.

56.     The policy included, among other coverages, indemnity coverage for physical damage to the Property caused by perils other than those specifically excluded under the policy.

57.     Xu submitted a claim to Allstate and requested payment for the damage to the Property.

58.     Allstate confirmed that the Property had sustained damage due to a covered peril and that Allstate had an obligation and duty to pay the ACV of the damaged portions of the Property.

59.     Allstate appointed an adjuster located in one of Allstate's centralized adjusting offices to adjust Xu's claim in accordance with Allstate's adjusting policies and procedures, and that adjuster inspected the damage to the Property for purposes of determining the ACV of the damage.

60.     On September 28, 2019, the Allstate adjuster submitted a final calculation of the ACV of the damage, a copy of which is attached hereto as **Exhibit 5**.

61.     Defendant's adjuster determined that the cost to repair the damage to Xu's Property was $4,909.07.

62.     The repair costs estimated by the Allstate adjuster included costs for material and labor to repair the Property, and sales tax on materials.

63.     Defendant calculated the ACV of the damaged property as repair or replacement cost less depreciation.

64.     In calculating ACV Defendant reduced the amount it would pay Plaintiff by $102.76 for depreciation.

65.     Defendant made a Coverage A – Dwelling Net ACV payment of $2,306.31 to Xu for the damage, and Xu received no further Coverage A – Dwelling payments from Allstate.

66.     In making its ACV calculation, Defendant depreciated the labor required to repair the Home; but unlike a physical "asset," labor does not depreciate over time.

67.    As discussed above, the fact that this depreciation not only included materials, but also included depreciation of non-materials, was intentionally concealed from Xu, and she could not know this was done based on the policy, or the papers from Allstate and its adjuster.

68.    The fact that Defendant never indicated that it was denying a portion of Xu's ACV claim, by withholding non-material depreciation, and affirmatively misstated that fact, deprived Xu of the ability to object to Defendant's unlawful conduct and file suit.

69.    Defendant intentionally and with the intent to fraudulently conceal and affirmatively misrepresent its wrongful conduct chose to hide and lie about, the fact that it was depreciating labor by withholding a detailed breakdown of the material and labor components of certain repair items, by deleting the box that showed this happening, and by providing a false definition of depreciation being taken.

70.    Defendant's depreciation of non-materials resulted in Xu receiving an ACV payment in an amount less than he was contractually entitled to under the insurance policy.

71.    Allstate breached its obligations under the policy by improperly depreciating the cost of non-materials and contractor overhead and profit.

## COUNT I
## BREACH OF CONTRACT

72.    Plaintiffs restate and incorporate by reference all preceding allegations.

73.    By depreciating labor and other non-material costs in the calculation of ACV Defendant breached its contractual obligations to Plaintiffs.

74.    Plaintiffs and all plaintiff class members satisfied or discharged all conditions precedent to Defendant's contractual obligations.

75.    As a direct and proximate result of Defendant's breach of its contractual obligations, Plaintiffs and the class members have received payment for their losses in amounts less than they were entitled to under their insurance policies.

76.    Defendant's practice of depreciating non-materials and contractor overhead and profit in the calculation of ACV payments is a breach of Defendant's contractual obligations.

## CLASS ACTION ALLEGATIONS

**A.    Class Definition**

77.    Plaintiffs seek to represent a class defined as follows:

All Allstate policyholders under any property policies issued by Allstate who made: (1) a structural damage claim for property located in the State of Ohio; and (2) which resulted in an actual cash value payment from which "non-material depreciation" was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of "non-material depreciation" causing the loss to drop below the applicable deductible.

  a.  In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within the Xactimate software.

  b.  The class period for the proposed class is the maximum time period as allowed by applicable law, including equitable tolling.

  c.  The class excludes all claims arising under policy forms expressly permitting the "depreciation" of "labor" within the text of the policy form and any claims in which the initial actual cash value payment exhausted the applicable limits of insurance.

  d.  Excluded from the Class are: (1) all claims wherein the initial actual cash value payment exhausted the applicable policy limits; (2) Defendant and its affiliates, officers or directors; (3) members of the judiciary and their staff to whom this action is assigned; and (4) Plaintiffs' counsel.

**B.    Class certification under Civil Rule 23(b)(3).**

78.    The relatively small amounts of damage suffered by each class member make filing separate suits by each class member economically unfeasible.

79.     Plaintiffs are similarly situated to the members of the class, and will fairly and adequately represent all members of the class.

80.     Plaintiffs have no relationship with Allstate other than as an adverse party in this case.

81.     Plaintiffs' claims are typical of the class claims.

82.     Calculating damages on a class-wide basis is straight forward and easily accomplished by simply running Xactimate with the "depreciate removal," "depreciate non-material" and "depreciate O&P" options un-checked, then subtracting the resulting depreciation amount from the depreciation amount originally withheld by Defendant and adding interest at the legal rate up to the point when Defendant pays the damages.

83.     Common questions of law and fact apply to Plaintiffs' claims and the claims for the class, and those common questions predominate over individualized questions.

84.     These common questions that are amenable to class wide resolution include:

a.     Whether Defendant's policy language allows Defendant to depreciate labor and other non-material costs and contractor overhead and profit in the calculation of ACV payments;

b.     Whether Defendant's depreciation of labor and other non-material and contractor overhead and profit in calculation of ACV payments breaches the insurance policy;

c.     Whether the term "actual cash value" as used in the Defendant insurance policies is ambiguous and susceptible to more than one reasonable interpretation, including an interpretation that permits depreciation of material only and not labor and other non-materials and contractor overhead and profit;

d.     Whether Defendant has a custom and practice of depreciating labor and other non-material costs and contractor overhead and profit in the calculation of ACV payments;

e.     Whether Defendant engaged in a course of conduct designed to fraudulently conceal its wrongful depreciation of non-material costs from the class members; and,

     f.    Whether Plaintiffs and the putative class have suffered damage as a result of Defendant's depreciation of labor and other non-material costs and contractor overhead and profit in calculation of ACV payments.

85.    Proposed counsel for the proposed class are knowledgeable and experienced in class and insurance litigation and will fairly and adequately represent the interests of the proposed class.

86.    The questions of law and fact common to members of the proposed class predominate over any individual questions of law or fact affecting any member of the class and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

87.    No unusual difficulties are anticipated in the management of this case as a class action.

88.    The proposed class consists of more than 40 individuals.

**C.    The class period is defined in light of Defendant's fraudulent concealment.**

89.    The maximum length of the putative class period depends on the accrual of the causes of action for breach of contract, including but not limited to inherent discoverability of the breach, and Defendant's intentional misrepresentations and fraudulent concealment of its unlawful practice of depreciating non-materials.

90.    In addition, any affirmative defenses Defendant may assert seeking to limit the length of the putative class period are subject to judicial doctrines concerning the accrual of the putative class members' claims and Defendant's fraudulent concealment of those claims.

91.    Defendant fraudulently concealed and intentionally misrepresented its practice of withholding non-material depreciation from both state regulators and putative class members.

92.     At all times relevant hereto, Defendant's insurance policies neither addressed nor called for withholding non-material depreciation.

93.     Similarly, Defendant's marketing materials did not address this practice, and consumers were not told of this practice when purchasing Defendant's property insurance products.

94.     Defendant never notified the Ohio Department of Insurance that Defendant was in fact withholding non-material depreciation.

95.     To further conceal its practice of withholding non-material depreciation, and to avoid any disputes with regulators and policyholders who made claims, Defendant unfairly used its claim estimating software to conceal its practice from policyholders.

96.     Like most property insurers, Defendant used a product called Xactimate to determine the amount of depreciation to apply to a claim.  Xactimate is used by both insurers and contractors to calculate the cost of rebuilding or repairing damaged property.  Xactimate uses "line item" pricing to determine repair costs.

97.     For all line items, Xactimate allows an insurer to depreciate non-materials by toggling on or off depreciation settings called "depreciate removal," "depreciation non-material" and "depreciate O&P."  The default form of Xactimate report shows on the first page how those options are set so the reader understands how depreciation is being applied.

98.     Defendant affirmatively modified the standard Xactimate report to hide and misrepresent its use of the non-material depreciation settings in Xactimate from both policyholder claimants and insurance regulators, if any, that may have investigated the same, by not disclosing its depreciation option settings in the reports provided to policyholders and by affirmatively misrepresenting what it was depreciating.

99.     Defendant further did so by affirmatively telling Plaintiffs and the putative class that the depreciation being taken was of "property" based on "age" and "wear and tear" and life expectancy, which was intentionally and materially false, by commission and omission, and designed to and did mislead Plaintiffs and the putative class, since non-materials do not age, depreciate or have a life expectancy.

100.    Defendant did not disclose and misrepresented on the paperwork accompanying the Xactimate estimate whether it was depreciating labor.  Other property insurers can and do disclose whether they are engaging in the practice of withholding non-material in the policy and/or in the paperwork accompanying the Xactimate estimate.

101.    This is readily available because Xactimate has printing options that allow the user to print the depreciation option settings used on the estimate, specifically including whether non-materials are being depreciated.  Other property insurers can and do print this key and material information on Xactimate estimates provided to policyholders. Defendant did not provide this information to its policyholders, and rather affirmatively withheld it, and thereby misrepresented same, including by falsely describing depreciation to fraudulently deceive its policyholders.

102.    As a result, Defendant took several affirmative steps to prevent an ordinary consumer (including Plaintiffs) from knowing that Defendant depreciated non-materials when making ACV payments to policyholders.

103.    At all times relevant hereto, Defendant was under an affirmative duty to fairly and fully disclose the manner in which it calculated ACV payments to policyholders. In addition, when providing damage reports to Plaintiff and similarly situated policyholders, Defendant was under a duty to be truthful, and to not deceive by omission, concealment or by affirmative misrepresentation.

104.    Defendant lied to and committed fraud by omission and commission against its policyholders to prevent them from pursuing the claim asserted herein.

105.    Defendant was in a superior position over policyholders to know that it was depreciating non-materials .

106.    Defendant's policyholders are not sophisticated in insurance claims handling procedures like Defendant, and they had no way to discern that Defendant was depreciating labor from the ACV calculations provided by Defendant. Defendant's false and deceptive description of depreciation further deceived policyholders and prevented them from discovering Defendant's wrongful conduct.

107.    In addition, Defendant controlled the settings for the software, which expressly permit a company to properly limit depreciation to materials only.  Moreover, policyholders do not have access to Defendant's software to determine whether it was used to depreciate non-materials.  Without such access, and due to Defendant's affirmative steps taken to conceal and misrepresent its depreciation of non-materials, Defendant's policyholders lacked the same access to information enjoyed by Defendant, and were provided false information by Defendant, and could not determine that Defendant was depreciating non-materials.

108.    Defendant's unlawful practice of depreciating labor was not disclosed in the insurance policy, in the claim estimate, in the form cover letter accompanying the estimate, in the marketing materials, or in Defendant's regulatory filings.  Just the opposite, Plaintiffs and the putative class members were told that depreciation being applied was to items based on their age and life expectancy.  The facts Defendant affirmatively misrepresented and fraudulently concealed are material to the cause of action for breach of the insurance contract, and are facts that a

18

reasonable person would have considered important in knowing that a breach had occurred and in making a claim for breach of the policy in a timely manner.

109.    Defendant's affirmatively misrepresentations and fraudulent concealment of material information in estimates and other statements was intended to deceive policyholders, in that policyholders would not know that their claim payments were actually diminished by the withholding of repair labor through the unfair manipulation of the Xactimate software and that policyholders would not contest the concealed practice in court or through regulatory action.

## **DEMAND FOR JUDGMENT**

Plaintiffs Andrea Perry and Ning Xu, both individually, and on behalf of each member of the proposed class, requests that the Court grant the following relief:

a.  Enter an order, pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying this action as a class action for a class defined above;

b.  Enter an order appointing James A. DeRoche of Garson Johnson LLC, Patrick J. Perotti of Dworken & Bernstein, Co., LPA, Erik D. Peterson of Mehr, Fairbanks & Peterson, Daniel Goetz and Eric Kennedy of Weisman Kennedy & Berris Co., LPA and Stephen G. Whetstone of Whetstone Legal, LLC as counsel for the plaintiff class, and appointing Plaintiffs Perry and Xu as the representatives Plaintiff for the class;

c.  Enter judgment in favor of Plaintiffs and the plaintiff class for their actual damages, being the amount that Allstate reduced actual cash value payments to each class member by depreciating non-material costs and/or contractor overhead and profit, and interest as provided by law;

d.  Award Plaintiffs and the plaintiff class all expenses of this action, and requiring Allstate to pay the costs and expenses of class notice and claim administration; and

e.  Award such other or further relief in law or equity in favor of Plaintiffs and the plaintiff class and against Defendants as the Court finds just and appropriate.

Respectfully submitted,

*/s/ Patrick J. Perotti*
Patrick J. Perotti, Esq. (#0005481)
**Dworken & Bernstein Co., L.P.A.**
60 South Park Place
Painesville, Ohio 44077
Phone: (440) 352-3391 | Fax: (440) 352-3469
Email: pperotti@dworkenlaw.com

James A. DeRoche, Esq. (#0055613)
**Garson Johnson LLC**
2900 Detroit Avenue
Van Roy Building, Second Floor
Cleveland, Ohio 44113
Phone: (216) 696-9330 | Fax: (216) 696-8558
Email: jderoche@garson.com

R. Eric Kennedy (OH #0006174)
Daniel P. Goetz (OH #0065549)
**WEISMAN, KENNEDY & BERRIS CO., L.P.A.**
2900 Detroit Avenue
Van Roy Building, Second Floor
Cleveland, Ohio 44113
Phone: 216.781.1111 | Facsimile: 216.781.6747
Email:     ekennedy@weismanlaw.com
             goetz@weismanlaw.com

Stephen G. Whetstone (0088666)
**Whetstone Legal, LLC**
P.O. Box 6
2 N. Main Street, Unit 2
Thornville, Ohio 43076
Phone: 740.974.7730 | Fax:  614.829.307
Email: steve@whetstonelegal.com

Erik D. Peterson (KY Bar 93003)
**Mehr, Fairbanks, & Peterson Trial Lawyers, PLLC**
201 West Short Street, Suite 800
Lexington, Kentucky 40507
Phone: 859-225-3731 | Fax:  859-225-3830
Email:     edp@austinmehr.com

*Counsel for Plaintiffs*

20

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants today, August 18, 2021.

_/s/ Patrick J. Perotti_

Patrick J. Perotti, Esq. (#0005481)

**Dworken & Bernstein Co., L.P.A.**

_One of the Counsel for Plaintiffs_